United States District Court
Southern District of Texas
**ENTERED**
January 03, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **LUIS ROBERTO DUENES JR.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:20- 2629** |
| | § | |
| **KILOLO KIJAKAZI[1], ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 14), Defendant's Cross-Motion for Summary Judgment (Document No. 15), Defendant's Brief in support of Cross-Motion for Summary Judgment (Document No. 16), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 17), and Plaintiff's Response to Defendant's Motion for Summary Judgment. (Document No. 18). After considering the cross-motions for summary judgment, the administrative record, and the applicable law, the Court concludes that the Commissioner committed reversible legal error in the administrative proceedings and that substantial evidence does not support the Commissioner's decision to terminate Plaintiff's benefits. Therefore, the Magistrate Judge ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is GRANTED, and this case is REMANDED for further proceedings.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration.

[2] The parties consented to the undersigned Magistrate Judge on December 18, 2020. (Document No. 13).

## I.  Introduction

Plaintiff, Luis Roberto Duenes Jr. ("Duenes") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") terminating his disability benefits after conducting a continuing disability review (CDR) and deciding that his disability had ceased and that he has not become disabled again. Duenes argues that the Administrative Law Judge ("ALJ"), Charles L. Brower, failed to consider all the evidence and that substantial evidence did not support the ALJ's decision. Duenes argues that the residual functional capacity (RFC) failed to account for his cane, and Lexi, his emotional support dog, and that the vocational expert testified based on a flawed hypothetical. Duenes seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for a *de novo* hearing. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Duenes' disability has ceased and that he has not become disabled again, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On April 4, 2008, the Social Security Administration (SSA) determined that Duenes was disabled as of December 9, 2007, and therefore entitled to disability insurance benefits under the Social Security Act. On February 18, 2011, the SSA conducted a continuing disability review (CDR) and determined that Duenes' disability continued. On June 22, 2017, the SSA conducted a second CDR and determined that his disability had ceased. Duenes requested reconsideration and consequently, a state agency disability officer conducted a hearing on July 30, 2018. On October 2, 2018, the SSA affirmed its determination that Duenes' disability had ceased as of August 1, 2017. On October 24, 2018, Duenes requested a hearing before an administrative law

judge (ALJ). The ALJ held a hearing on April 1, 2019.  Following the hearing, Duenes'
representative conceded that Duenes' disability ceased as of August 1, 2017, but came forward
with evidence that it re-commenced on or about October 29, 2017.  The ALJ issued his decision
on August 6, 2019, finding that Duenes' disability ceased as of August 1, 2017, and he has not
become disabled since that date.

## III.  Standard for Review of Agency Decision

The Court, in its review of the Commissioner's decision to terminate disability benefits, is
only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and
(2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*,
174 F.3d 692, 693 (5th Cir. 1999). Substantial evidence is not a high threshold; it means only "such
relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek
v.* Berryhill, ___U.S. ___, 139 S.Ct. 1148, 1152 (2019). Substantial evidence is "more than a
scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The
evidence must create more than "a suspicion of the existence of the fact to be established, but no
'substantial evidence' is found where there is a 'conspicuous absence of credible choices or 'no
contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting
*Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)). Title 42, Section 405(g) limits judicial
review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social
Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C.
§ 405(g). The Act explicitly grants the district court the power to enter judgment, upon the
pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of
Social Security with or without remanding the case for a rehearing" when not supported by
substantial evidence. *Id.* While it is incumbent upon the Court to examine the record in its entirety

to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the Court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). "Conflicts in the evidence are for the Commissioner and not for the courts to resolve." *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000) (internal punctuation omitted) (quoting *Selders v. Sullivan*, 914 F.23 614, 617 (5th Cir. 1990)). Substantial deference is given to the Commissioner's factual findings; however, the Commissioner's legal conclusion and claims of procedural error are reviewed *de novo*. *Carr v. Apfel*, 133 F. Supp. 2d 476, 479 (N.D. Tex. 2001). If the Court concludes that the ALJ applied correct legal standards and substantial evidence supports the ALJ's decision, the Court is to affirm the Commissioner's decision. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## IV.  Law and Burden of Proof

An individual is entitled to disability insurance benefits under the Act if he is insured for disability insurance benefits and is under a disability. 20 CFR § 404.315. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists

4

in the immediate area in which he lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of impairment is not enough to establish that one is

suffering from a disability. Instead, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

After the SSA finds a claimant disabled, it must periodically evaluate the claimant's

impairment by conducting a continuing disability review (CDR) to determine whether the

disability continues. 42 U.S.C. §423(f); 20 CFR § 404.1594(a). "Medical improvement" is defined

as "any decrease in the medical severity of your impairment(s) which was present at the time of

the most recent favorable medical decision that you were disabled or continued to be disabled."

20 C.F.R. §404.1594(b)(1).   The regulations provide that during the CDR, the claimant must

provide the SSA with reports from his physician, psychologist, or others who have treated or

evaluated him as well as any other evidence that will help determine whether the disability

continues. 20 CFR § 404. 1593 (b). The SSA then develops a complete medical history covering

at least the 12 months preceding the date the claimant completed a report about his continuing

disability status. *Id*. If the claimant's condition has improved his eligibility to receive benefits may

terminate.  *See Griego v.* Sullivan, 940 F.2d 942, 944 (5th Cir. 1991)(citing 42 U.S.C. 423(f)).

Here, Duenes completed the CDR report on May 11th, 2017. (Tr. 253).

In determining whether a claimant's disability continues to exist or there has been medical

improvement and disability benefits should be terminated, the Commissioner applies an eight-step

sequential evaluation process. *See* 20 C.F.R. § 404.1594(f). The steps are as follows: the

Commissioner must determine (1) whether the claimant is currently engaged in substantial gainful

activity, (2) if not, whether the claimant has an impairment or a combination of impairments that

meets or medically equals the severity of an impairment enumerated in the relevant regulations, (3) if not, whether there has been medical improvement, (4) if there has been medical improvement, whether the medical improvement is related to the claimant's ability to do work, (5) if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, whether an exception to medical improvement applies, (6) if there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions applies, whether the combination of the claimant's current impairments is severe, (7) if the combination of the claimant's current impairments is severe, whether the claimant, based on his assessed RFC, is able to engage in past relevant work, and (8) if not, whether the claimant is able to perform other substantial gainful activity given his RFC, age, education, and past work experience. *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991) (citing 20 C.F.R. § 404.1594(f)). In determining medical improvement in disability termination proceedings, the ultimate burden of proof lies with the Commissioner. *Id*. at 944; *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002).

In the instant action, the ALJ determined, in his August 6, 2019, decision that Duenes' disability ended on August 1, 2017, and that he has not become disabled again since that date. (Tr. 38). In particular, the ALJ determined that Duenes had not engaged in substantial gainful activity since August 1, 2017, (step one); that Duenes has not had an impairment or a combination of impairments that meets or medically equals the severity criteria of a listed impairment (step two); that Duenes has undergone medical improvement (step three); that Duenes' medical improvement is related to his ability to work (step four). (Tr. 29). The ALJ then skipped step five because he found Dunenes' medical improvement related to his ability to work. (Tr. 30). At step six the ALJ found that Duenes has had a combination of impairments that are severe. *Id*. Particularly, Duenes

had venous insufficiency of the right calf (secondary to vascular malformation and varicose veins, status post-ablation in March and June 2018), a disorder of the lumbar spine, a disorder of the cervical spine, status post-left trans-radial amputation, anxiety, and depression. *Id*. The ALJ further found that Duenes had the residual functional capacity to work at the light exertional level. In particular,

> [The claimant] can lift and/or carry 20 pounds occasionally, 10 pounds frequently; can stand and/or walk about 6 hours in an 8-hour workday; can sit about 6 hours in an 8-hour workday. He has non-exertional limitations: He can use his left upper extremity, amputated below the elbow, as a helper only. He can never climb ropes, ladders, or scaffolds; can only frequently climb ramps or stairs; can only frequently balance, stoop, kneel, or crouch; can only occasionally crawl. He can understand, carry out, and remember only detailed (non-complex) instructions; can use judgment to make only detailed (non-complex) decisions; can only frequently interact with supervisors, coworkers, and the public.

(Tr. 31). The ALJ further found that Duenes has been unable to do his past relevant work as an artillery crew member (step seven). (Tr. 37). Moreover, the ALJ found that Duenes has been able to adjust to other work and that, based on Duenes' RFC, age, education, work experience, and the testimony of a vocational expert, Duenes could perform work as an usher or a sandwich board carrier. (Tr. 37). Finally, The ALJ concluded that Duenes' disability has ended on August 1, 2017, and that he has not become disabled again since that date. (Tr. 37-38).

Duenes does not challenge the ALJ's finding concerning the improvement of his disability with respect to the left trans-radial amputation where the medical evidence shows that Duenes no longer wears a body-powered or myoelectric prosthesis and that his pain secondary to the left upper extremity amputation is controlled with medication. (Tr. 29). Duenes argues that the ALJ failed to consider a letter sent by his legal representative on April 9, 2019, showing that his venous insufficiency in his right lower extremity re-started in October 2017, and that he has since become disabled due to that condition. (Tr. 191-92).

He further argues that the ALJ erred in formulating his RFC because it fails to account for his prescribed cane and prescribed emotional support animal, and that the VE identified jobs that did not account for his need for a cane and emotional support animal. As a result, the Court must determine whether substantial evidence supports the ALJ's determination that Duenes has not become disabled again in October 2017.

## V. Discussion

Duenes raises three issues on appeal. First, that substantial evidence does not support the ALJ's step eight finding that jobs exist in significant numbers in the economy that he can perform. Second, that the ALJ failed to consider all the evidence—particularly Duenes prescribed cane to ambulate and his prescribed emotional support animal "Lexi", both of which are medically necessary. And third, that the RFC failed to encompass *all* of Duenes functional limitations— namely his need for a cane and an emotional support animal, and that he is unable to perform a limited range of light work. The Commissioner responds that substantial evidence supports the ALJ's decision and that the ALJ applied the applicable law.  The Court agrees with the Duenes second point of error—concerning the ALJ's failure to consider all the evidence—as it relates to Duenes right calf problem and prescribed cane to ambulate, and his prescribed emotional support dog, Lexi. Additionally, the Court agrees with the Duenes third point of error—concerning the RFC's failure to address Duenes need for a cane and an emotional support animal. Because the matter must be remanded for further development of the record and additional proceedings, the Court need not address Duenes first point of error concerning the hypothetical question posed to the VE based on the RFC.

On April 4, 2008, the Social Security Administration (SSA) determined that Duenes was disabled as of December 9, 2007, and therefore entitled to disability insurance benefits under the

Social Security Act. On February 18, 2011, the SSA conducted a CDR and determined that Duenes' disability continued. The SSA conducted the instant CDR in May 2017. Duenes reported following on going symptoms: (1) high levels of anxiety, (2) left trans-radial amputation (to include nerve pain), (3) back issues C-5, C-7, T-5 herniated disk, and (4) mild traumatic brain injury. (Tr. 254). Duenes reported that he had not been seeing a doctor for any mental condition within the last 12 months and denied using an assistive device such as a cane, or a walker. (Tr. 254, 258).

The ALJ noted that during the April 2019 hearing that Duenes alleged disability due to (1) physical pain and swelling in his right calf, with pain running up to his neck, (2) phantom pain in his left arm, and (3) mental impairment (anxiety and depression), for which he takes venlafaxine, temazepam, and prazosin. (Tr. 28, 29). At step six, the ALJ wrote:

> Claimant has had a combination of impairments that is severe: venous insufficiency of the right calf (secondary to vascular malformation and varicose veins, status post-ablation in March and June 2018), a disorder of the lumbar spine, a disorder of the cervical spine, status post-left trans-radial amputation, anxiety, and depression. These are Claimant's current impairments. 20 C.F.R. § 404.1594(f)(6).

(Tr. 30). The ALJ further found that Duenes' mild traumatic brain injury, back issues at C-5, C-7, and T-5, sleep apnea, tobacco use disorder, and gastroesophageal reflux disease are non-severe impairments. (Tr. 31). The ALJ opined that Duenes has the RFC to perform a limited range of light work:

> Since August 1, 2017, Claimant has had the residual functional capacity to work at the light exertional level: He can lift and/or carry 20 pounds occasionally, 10 pounds frequently; can stand and/or walk about 6 hours in an 8-hour workday; can sit about 6 hours in an 8-hour workday. He has non-exertional limitations: He can use his left upper extremity, amputated below the elbow, as a helper only. He can never climb ropes, ladders, or scaffolds; can only frequently climb ramps or stairs; can only frequently balance, stoop, kneel, or crouch; can only occasionally crawl. He can understand, carry out, and remember only detailed (non-complex) instructions; can use judgment to make only detailed (non-complex) decisions; can only frequently interact with supervisors, coworkers, and the public.

(Tr. 31).

In determining Duenes' RFC, the ALJ assessed Duenes' (1) left upper extremity amputation, (2) mental impairment including anxiety and depression, and (3) right calf problem. The Court agrees with the Commissioner that substantial evidence supports the ALJ's assessment concerning Duenes' left upper extremity amputation and mental impairment. However, the same cannot be said about Duenes' right calf problem based on new medical evidence.

**(1) Left Upper Extremity Disability**

With respect to Duenes' left upper extremity amputation, the ALJ noted that in January 2017, Duenes visited his primary care provider at the VA's Audie Murphy Memorial Hospital for the first time since 2012. He was no longer wearing a body-powered or using a myoelectric prosthesis. (Tr.32, 33). The ALJ further noted that, in May 2017, Duenes' pain in his left upper extremity was controlled per the VA Primary Care. (Tr. 33). Additionally, the ALJ noted that, in 2017 and 2018, Dr. Detmering has repeatedly noted that Duenes' pain was controlled and stable overall on current management. (Tr. 36). Finally, a medical exam in February 2018, showed a healed left upper extremity amputation. (Tr. 33).

As previously mentioned, substantial evidence is such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Perez*, 415 F.3d at 461. Therefore, the ALJ could reasonably conclude that an amputation, that has shown to be healed upon clinical examination, for which the claimant has stopped using a prosthesis, and the resulting pain has been controlled by medications, has improved. Based on the objective medical evidence, medical opinions, subjective evidence, and other evidence, the Court concludes that substantial evidence supports the ALJ's determination concerning Duenes' left upper extremity disability. Therefore, the Court agrees with the ALJ's conclusion that Duenes' disability with respect to his left upper extremity amputation has improved.

10

**(2) Mental Impairment**

With respect to Duenes' mental impairment, the ALJ noted the following:

Regarding Claimant's allegation of disabling symptoms of depression and anxiety, the evidence shows that his symptoms are controlled with medication. He testified that he takes venlafaxine, temazepam, and prazosin, prescribed about 1½ months prior to hearing, and that prior to his current medication regimen, he had taken citalopram, which had effectively controlled his symptoms. Moreover, serial mental status examinations during the relevant period routinely reveal no significant limitation of function. He occasionally reports a depressed or anxious mood, sometimes accompanied by a sad effect, but mental status exam findings are otherwise routinely normal. Consultative psychological evaluation similarly produced a normal mental status examination. He had adequate and neat grooming, normal gait and posture, good impulse control. He was appropriately dressed. He had normal speech, a cooperative behavior, a friendly manner, an appropriate affect. He related adequately and was attentive, oriented, and adequately motivated on testing. Recent and remote memory were good; recall ability was fair. Attention and calculation skills were fair. General knowledge, ability to think abstractly, insight, and judgment were good; thought process was normal. (4F).

Claimant's allegation of disabling symptoms is not consistent with other evidence, such as the timing of his allegation of disabling depression and anxiety and the timing of his mental health treatment. In May 2017, at the outset of the CDR, he did not allege disability due to depression, anxiety, or any mental impairment, aside from mild TBI (6E2). Moreover, he did not seek mental health treatment until October 2017 (7F31), *after* commencement of the CDR, the timing of which suggests that he pursued the treatment for purpose of secondary gain.

Claimant's allegation of disabling symptoms is not consistent with his demeanor at hearing. He alleges disabling depression and anxiety, yet during the hearing, he exhibited no problem in any of the four broad functional areas of § 1520a.

(Tr. 36).

The Court agrees with the ALJ's analysis regarding Duenes' mental impairment and that

it had improved. At no point did the record suggest that Duenes' mental impairment was severe.

Duenes' mental impairment symptoms have consistently ranged from minimal to moderate at the

most with no functional limitations on his ability to work. For example, on November 30, 2017,

Dr. Boudreaux, Ph.D. wrote "claimant's mood was mildly depressed, and affect was pleasant and

sad. Thought was logical. The claimant may be somewhat restricted by symptoms but would not

be wholly compromised in the ability to function in a work setting." (Tr. 542); on January 18, 2018, Psychologist Liza Maldonado at the Audie L. Murphy Memorial Hospital administered the Generalized Anxiety Disorder, 7 items test (GAD-7) and the Patient Health Questionnaire 9 test (PHQ-9) with the resulting scores suggesting minimal anxiety and mild depression respectively. (Tr. 575); on February 15, 2018, Psychologist Liza Maldonado at the Audie L. Murphy Memorial Hospital administered another Generalized Anxiety Disorder, 7 items test (GAD-7) and Patient Health Questionnaire 9 test (PHQ-9) with the resulting scores suggesting mild anxiety and moderate depression respectively. (Tr. 570); on April 2, 2018, more testing suggested minimal anxiety and mild depression. (Tr. 565); on May 2, 2018, more testing suggested minimal anxiety and minimal depression. (Tr. 557). Additionally, in the most recent mental health evaluation, Dr. Smitherman, PhD wrote that Duenes' behavior was appropriate for the setting, his mood was euthymic (normal), his affect was congruent with mood, his thought process was linear and goal oriented, his thought content was appropriate, and his insight was good. (Tr. 771). Based on the objective medical evidence, medical opinions, subjective evidence, and other evidence, the Court concludes that substantial evidence supports the ALJ's determination that Duenes' mental impairment had improved.

Duenes argues that the ALJ erred by not including his need for his emotional support animal "Lexi", which had been prescribed, in formulating his RFC because the emotional support animal keeps his anxiety under control.  Turning first to the emotional support dog, the record shows that on or about February 8, 2019, Duenes was prescribed an emotional support animal. The prescription states in pertinent part: "please allow patient to have dog with him [sic] emotional support animal."  (Tr. 706).  Additionally, Duenes testified that his father brought him and his emotional support animal to the administrative hearing.  (Tr. 73).  Duenes testified that "Lexi" had

been with him for six months.  (Tr. 74).  Notwithstanding Duenes' testimony about Lexi, and the prescription for Lexi by Duenes' mental health care provider at the VA, the ALJ made no determination about whether Lexi was medically necessary. "[T]he use of a service dog must be medically necessary to be considered in an RFC assessment."  *See McGehee v. Berryhill*, 386 F.Supp. 3d 80, 87 (D. Mass. July 2, 2019)(citing *Santos v. Colvin*, No. 3:12-cv-5827-KLS, 2013 WL 5176846, at *2, *6 (W.D. Wash. Sept. 12, 2013)(finding a reversible error where the ALJ did not consider the vocational impact of plaintiff's use of a service animal when "at least some evidence in the record" showed that "plaintiff's use of a service animal when "at least some evidence in the record" showed that "plaintiff's use of a service dog [was] medically necessary"); *Rentfro v. Colvin*, No. 14-cv-3015, 2015 WL 12868081, *13 (C.D. Ill. Oct. 21, 2015)(finding that the ALJ's failure to adequately address evidence of plaintiff's prescription from doctor for service dog [was] material and noting that it was unclear "that a person could perform a cleaning job if her RFC required her to take a service dog with her to the job site."); *Payano v. Colvin*, No. 2:15-cv-294-RFB-GWF, 2017 WL 4778593, at *4 (D. Nev. Oct. Oct. 23, 2017)(finding a letter from a psychiatrist recommending a service dog alone does not support an assessment that a dog is necessary for plaintiff to work and therefore it was a harmless error for the ALJ to omit the need for a service dog in the hypothetical question to the VE where the evidence failed to support that a service dog was necessary for Plaintiff to work.)  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  At no point did the ALJ explain why he chose not to include an emotional support dog in Duenes' RFC. Because it is unclear whether the ALJ considered Duenes' prescribed emotional support animal, the Court disagrees with the defendant's argument concerning the emotional support animal. In *Lewis v. Saul*, this Court found that a prescription of

an emotional support animal did not conflict with the ALJ's mental RFC assessment because, as the Appeals Council concluded, it did not "show a reasonable probability that it would change the outcome of the decision." *Lewis v.* Saul, CV H-19-2380, 2020 WL 4194023, at *8-9 (S.D. Tex. July 7, 2020), report and recommendation adopted, CV H-19-2380, 2020 WL 4193270 (S.D. Tex. July 21, 2020). Because Duenes *has* a prescription for a service dog from his medical provider to help with his anxiety related issues, and there was no conflicting evidence to the contrary, the ALJ should have considered whether "Lexi" was medically necessary. As such, the matter must be remanded for further development of the record concerning Duenes' need for his emotional support animal Lexi.

### (3) Right Calf Problem

With respect to Duenes' right calf problem, the ALJ noted that it started in October 2017. Consequently, Duenes underwent his first venaseal ablation surgery on March 28, 2018. The ALJ wrote the following:

> On November 29, 2017, Claimant went to VA General Surgery for evaluation of a soft tissue mass in his right calf, which he had noticed about a month earlier (11F30). Clinical examination revealed a 3 cm x 1 cm mass, visible with flexing, tender to touch (11F32). General Surgery scheduled him for excision of the mass (11F33). On January 10, 2018, Claimant returned for the excision (11F24). However, ultrasound of the calf showed no fluid collection or mass of concern and only a mildly prominent superficial vein (11F25). Therefore, General Surgery referred him to Vascular Surgery for evaluation of the vein (11F25).
>
> On February 14, 2018, Claimant went to VA Vascular Surgery for evaluation of the protruding vein in the right posterior calf (Ex. 11F19). Clinical examination revealed normal gait, tender varix posterior calf, and palpable pulses. Dr. Pounds, MD ordered a duplex study which, on February 14, showed no evidence of deep venous thrombosis, some evidence of venous reflux. Posterior calf imaging was normal, with no evidence of hematoma, fluid collections, or varicose veins (11F48). Dr. Pounds assessed venous insufficiency; recommended venaseal ablation (11F19-20), which was done on March 28, 2018 (11F14).

(Tr. 33).

Because Duenes' right calf problem continued, he submitted to a second venaseal surgery on June 6, 2018. (Tr. 796). On July 11, 2018, Duenes returned for follow-up. He was walking with a cane. Upon clinical examination, there was tenderness to palpation in the medial calf and popliteal area with small reticular veins. (Tr. 556). Dr. Pounds noted that "all superficial disease has been corrected" and "suspect another source such as [musculoskeletal] or [neurological]." *Id*. On November 8, 2018, Dr. Detmering, MD noted that Duenes walked with a limp favoring the right side and used a cane. (Tr. 620). Moreover, in November 2018, the ALJ noted that Duenes had to undergo further testing to determine the cause of his right calf problem. The ALJ wrote the following:

> On November 13, 2018, MRI of the right calf was normal (14F7; 18F20; 20F22). On November 14, 2018, MRI of the lumbar spine showed mild spondylosis (14F5-6; 15F19-20; 20F20-21). On November 15, 2018, x-ray of the right tibia and fibula, secondary to Claimant's report of right calf pain, showed (1) bony mineralization within normal limits, (2) no fracture or dislocation, (3) a small osseous excrescence, and (4) no soft tissue calcification (14F5).
>
> On November 29, 2018, Claimant went to an EMG Consult, secondary to right calf pain (13F10). Electromyography showed (1) evidence suggestive of a sensory/motor right common peroneal nerve lesion, most likely at or about the fibular head, and (2) no evidence of a right motor radiculopathy affecting the L2-S1 myotomes (13F14).

(Tr. 34).

On February 15, 2019, Duenes' compartment syndrome test was negative. (Tr. &36-37). On March 5, 2019, Duenes's clinical examination revealed no clubbing, cyanosis, or edema in the bilateral lower extremities. (Tr. 794). Upon clinical examination of the musculoskeletal system, Duenes ambulated with a "walking stick and antalgic gait[3], right hip hike with decreased time

---

[3] The National Center for Biotechnology Information defines antalgic gait as follows: To avoid pain weight is put on the affected leg for as short a time as possible, resulting in a limp. The patients appear to be walking as if there were a thorn in the sole of the foot. To reduce the load on the affected leg the patients lift and lower their foot in a fixed ankle position. https://www.ncbi.nlm.nih.gov/medgen/?term=antalgic%20gait

spent in single limb stance on the right." *Id*. Duenes was unable to perform heel walking or calf raising on the right foot secondary to pain in his calf. (Tr. 795). He also had increased swelling and mild bruising to his right calf with decreased muscle bulk. *Id*. Additionally, the most recent EMG, on April 25, 2019, showed evidence suggestive of a right demyelinating peroneal[4] nerve lesion affecting the motor fibers of the extensor digitorum brevis (EDB) at or about the fibular head. (Tr. 49). Upon this record, based on the most recent EMG and continuing symptoms related to this right lower extremity at or about the fibular head, Duenes has shown a new condition that warrants further development of the record.

Duenes further argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to consider his prescription for a cane. Duenes points to the prescription for a cane along with treatment notes documenting his difficulty walking, which required him to rely on a cane to ambulate.  The Commissioner counters that Duenes has not demonstrated that the cane was medically necessary as required by the applicable regulations. Additionally, the Commissioner argues that even if the ALJ had found the cane was medically required and should have been included in the RFC, any error was harmless because the VE testified about jobs that exist in significant numbers that Duenes could perform.

The Social Security regulations recognize that hand-held assistive devices can impact a claimant's "functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(J)(4).  However, an ALJ need not consider an assistive walking device in the RFC assessment unless the device is medically necessary.  The law is clear that "to find a hand-held assistive device is medically required, there must be medical documentation establishing the need

---

[4] The Merriam-Webster Dictionary defines peroneal as follows: of, relating to, or located near the fibula

for a hand-held device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). Additionally, the ALJ "must always consider the particular facts of a case." *Id.* "Neither a prescription for a hand-held assistive device, nor a lack thereof, is 'necessarily dispositive of medical necessity." *Schnurpel v. Berryhill*, No. 2:16cv6042, 2017 WL 2390548, at *13 (S.D. W. Va. Apr. 17, 2017).

In the instant action, the ALJ did not address Duenes's prescription for a cane, use of cane, or medical records documenting observations by his health care providers about his use of a cane and antalgic gait. There is no discussion about whether the cane is medically necessary. Additionally, the recent abnormal EMG study indicating problems along the tibial head, is consistent with Duenes' testimony concerning leg pain and his need for a cane. Further, the VE was not questioned about whether the need to ambulate with a cane would erode Duenes' ability to perform the jobs identified by the VE. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton,* 209 F.3d at 455. Duenes has met his burden in showing how the ALJ's failure to consider the cane prescription prejudiced him. The ALJ failed to consider objective medical evidence, such as Duenes' peroneal nerve lesion, which may support his need for a cane to ambulate, and how he can perform light work with his left upper extremity, amputated below the elbow, as a helper only, and use a cane in his right hand. In *Temple v. Saul*, this Court found that an ALJ's RFC assessment and related hypothetical deficient because they failed to account for the plaintiff's need to ambulate with an assistive device (i.e., a cane or a walker). 4:19-CV-3320, 2020 WL 6075644, at *2 (S.D. Tex. Oct. 14, 2020). In *Temple*, this Court reasoned that the need to ambulate with an assistive device

requires additional reaching, handling, and fingering limitations inherently associated with the need to grasp an assistive device while standing, walking, and performing work-related activities. *Id*. "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for the device to aid in walking or standing and describing the circumstances for which it is needed." *Id*. at *3. The ALJ must always consider the particular facts of a case to determine whether a hand-held assistive device is medically required. *Id*.

Here, the ALJ's RFC assessment failed to include any limitations accounting for Duenes' need for a cane to ambulate. Both objective medical evidence and subjective evidence support Duenes' need for a cane and the ALJ should have addressed that evidence. The record shows that on November 8, 2018, Dr. Detmering prescribed a cane for Duenes due to "pain in right leg." (Tr. 617). On November 9, 2018, Duenes went to the Audie L. Murphy Memorial Hospital and was trained on how to use it. *Id*. Similar to the plaintiff in *Temple* who appeared at the hearing before the ALJ using a walker, Duenes used his cane to ambulate on many occasions including at the hearing before the ALJ. (Tr. 85).

Furthermore, although the ALJ acknowledged Duenes antalgic gait, he did not include it in his RFC assessment. The ALJ wrote that the "clinical physical examinations during the relevant period reveal no limitation of function *aside from an antalgic gait* and, occasionally, tenderness to palpation and tenderness with flexion." (Tr. 35). The ALJ reasoned that "a wide variety of diagnostic tests have revealed no significant abnormality." *Id*. However, the record shows that the most recent EMG, on April 25, 2019, revealed "evidence suggestive of a right demyelinating peroneal nerve lesion." (Tr. 49). Duenes may have undergone a wide variety of diagnostic tests to rule out different causes of his pain—such as varicose veins and deep vein thrombosis—but a neurological disorder, such as that demyelinating peroneal nerve lesion, may have been the cause.

Indeed, Dr. Pounds had suggested exactly that on July 15, 2018. (Tr. 556). The ALJ should have addressed the medical findings in that EMG report or should have explained the reasons for this omission. Not only did Duenes' physician prescribe a cane but the nerve lesion finding in the most recent EMG report supports his need for it—only because other diagnostic tests have revealed no abnormality concerning the claimant's vascular and musculoskeletal systems in his right calf. The ALJ discussed the records which show Duenes' cane use but he neither used the medical records to evaluate the medical necessity of a cane nor incorporated the use of the cane into the RFC. The ALJ did not question Duenes about his use of the cane or seek clarification about his ability to walk or balance.  Additionally, the VE did not address whether the jobs identified could be performed by someone who needsThis failure was not harmless.  *See Zidanich v. Colvin*, Case No. 16-cv-87-FPG, 2016 WL 6275233, at * 4 (W.D. N.Y. Oct. 27, 2016)(explaining that when a claimant "needs to use a cane for support and balance, it means that at least one hand is not free to hold other objects and perform the lifting and carrying requirements of light work, which are not minimal'").

In summary, substantial evidence does not support the ALJ's decision concerning the termination of Duenes' disability benefits, and the matter must be remanded.

## VI. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ committed reversible legal error in the administrative proceedings, that substantial evidence does not support the ALJ's decision to terminate Plaintiff's benefits, and that the Commissioner's decision should be vacated, and remanded for further proceedings.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 14) is GRANTED, Defendant's Cross-Motion for Summary Judgment (Document No. 15) is DENIED,

and the decision of the Commissioner of Social Security is VACATED, and this case REMANDED for further fact-finding consistent with this opinion.

Signed at Houston, Texas, this __3rd__ day of _____January_____, 2022.

*Frances H. Stacy*

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE